### United States District Court
### For the District of Columbia

EDWARD JACOB LANG,
United States Citizen, Pretrial Detainee
(DCDC #376444) held at Metropolitan
Detention Center, Brooklyn, located at
80 29th Street, Brooklyn, NY 11232;

                        *Petitioner,*

    *v.*

MERRICK GARLAND in his official
Capacity as United States Attorney
General, 950 Pennsylvania Ave.,
NW Washington, D.C., 20530;

      *and*

HERIBERTO TELLEZ in his Official
Capacity as DEPUTY WARDEN
of Metropolitan Detention Center,
Brooklyn, located at 80 29th Street,
Brooklyn, NY 11232;

                *Respondents.*

Civil Action #: _____

---

## PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. 2241 AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
99 Park Avenue, Suite 810
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

ANTHONY SABATINI, ESQ.
**Sabatini Law Firm, P.A.**
411 N. Donnelly St., Suite 313
Mount Dora, FL 32757
*Phone* 352.455.2928

Anthony@Sabatinilegal.com

*Attorneys for Mr. Lang*

# TABLE OF CONTENTS

I.     **OVERVIEW AND BRIEF HISTORY** ........................................................ 1

II.    **PARTIES** .....................................................................................  3

III.   **JURISDICTION AND VENUE** ............................................................  4

IV.   **STATEMENT OF FACTS** ...................................................................  6

       A.    PETITIONER LANG'S PERSONAL HISTORY LEADING
            TO THIS PETITION ................................................................... 6

       B.    PETITIONER'S PRIOR HISTORY AT THE DC JAIL –
            AKA "DC GITMO JAIL" .............................................................. 9

       C.    LANG'S TRANSFER TO THE FAMOUS PENITENTIARY IN
            LEWISBURG, PA ................................................................... 19

       D.    ARLINGTON, VA JAIL: 22 HOURS IN, AND ONLY 2 HOURS OUT.................... 20

       E.    AFTER BEING TRANSFERRED TO MDC BROOKLYN, LANG IS BACK AT
            THE DC JAIL ..................................................................... 21

       F.    THE SECOND TIME PETITIONER LANG WAS TRANSFERRED TO LEWISBURG . . . . . . . 24

       G.    THE CONDITIONS OF CONFINEMENT PETITIONER LANG HAS ENDURED AS A
            PRETRIAL DETAINEE, MUST NOT STAND .......................................... 26

       H.    DEPRIVATION OF PETITIONER'S CONSTITUTIONAL RIGHTS: LET'S START WITH
            THE FIRST AMENDMENT.......................................................... 27

       I.    DEPRIVATION OF CONSTITUTIONAL RIGHTS: SIXTH AMENDMENT ...................29

       J.    DEPRIVATION OF CONSTITUTIONAL RIGHTS:
            FIFTH AND EIGHTH AMENDMENTS ................................................ 30

       K.    THE INMATE GRIEVANCE PROCESS IS IRREPARABLY BROKEN ..................... 31

V.  **LEGAL STANDARD**.................................................................... 33

VI.  **CAUSES OF ACTION** ................................................................. 35

FIRST CLAIM:     RESPONDENT'S DELIBERATE INDIFFERENCE TO PETITIONER'S
                 SAFETY VIOLATES THE FIFTH AMENDMENT'S
                 DUE PROCESS CLAUSE…………………………………………… 35

SECOND CLAIM:    RESPONDENT'S ILLEGAL USE OF SOLITARY CONFINEMENT
                 TO PUNISH PETITIONER VIOLATES THE FIFTH AMENDMENT'S
                 DUE PROCESS CLAUSE……………………………….............   38

THIRD CLAIM:     RESPONDENT'S ILLEGAL USE OF PROLONGED
                 SOLITARY CONFINEMENT TO PUNISH PETITIONER VIOLATES THE
                 FIFTH AMENDMENT'S DUE PROCESS CLAUSE AND THE
                 EIGHT AMENDMENT'S CRUEL AND UNUSUAL
                 PUNISHMENT CLAUSE …………………………………………….39

FOURTH CLAIM:    RESPONDENT'S REPEATED INTERFERENCE WITH PETITIONER'S
                 RIGHT TO COUNSEL AND TO MEANINGFULLY PARTICIPATE IN
                 HIS DEFENSE VIOLATES PETITIONER'S SIXTH
                 AMENDMENT RIGHTS......................................................43

FIFTH CLAIM:     RESPONDENT'S REPEATED RETALIATION FOR SPEAKING TO
                 THE PRESS AND THE PUBLIC ABOUT HIS UNLAWFUL DETENTION
                 VIOLATES PETITIONER'S FIRST
                 AMENDMENT RIGHTS……………………………………….....47

VII.  **CONCLUSION** …………………………………..…………….………....……   48

VIII. **PRAYER FOR RELIEF**...................................................................48

## I.    OVERVIEW AND BRIEF HISTORY

1.    Petitioner EDWARD JACOB LANG (hereafter "Jake", "Lang", or "Mr. Lang"), petitions the Court for a Writ of Habeas Corpus because he is a United States citizen pretrial detainee currently being held at the Metropolitan Detention Center, in Brooklyn, NY 11232 (hereafter "MDC Brooklyn").

2.    The overall basis of this petition is that Mr. Lang continues to be held and transferred in violation of his constitutional and human rights.

3.    Petitioner alleges that he has been treated with deliberate indifference, which has caused him to suffer irreparable harm, and that he has been repeatedly punished and subjected to prolonged solitary confinement for punitive reasons.

4.    The basis for these claims are, *inter alia*, that: (1) Mr. Lang has been continuously denied bond for more than three years; (2) he has been ordered a court-ordered laptop to review discovery and participate in his own defense, but has been denied accept to such computer since November 2023; (3) Mr. Lang has a *hybrid* representation motion currently pending before the honorable Carl Nicolas, where such application the Court is "inclined" to grant, thereby affording Lang greater access to participate in his own defense; (4) Mr. Lang has been moved jails more than a dozen times in the last three years, where his property has been lost or

destroyed when Lang is being transported[1]; and (5) since Lang has been transferred back to MDC Brooklyn, a former Capitol police officer posted on social media under a picture of Lang: "He fought me in the tunnel. I hope other inmates find out . . . They wanted to fight antifa". Such perceived threat[2] caused Lang to naturally react and make posts on social media.[3]

5.       This list is not exhaustive, but rather establish the point of how Lang's constitutional rights have continued to be denied; how Lang has been treated with deliberate indifference, which has caused him to suffer irreparable harm. In addition to these claims, Lang will establish that he has been repeatedly punished and subjected to prolonged solitary confinement for punitive reasons – at times for months without a disciplinary charge even being alleged.

6.       Overall, Petitioner Mr. Lang respectfully requests that this Court, amongst other things, grant this Petition and order his immediate release from Respondents' unlawful custody, and make a finding that Lang's constitutional rights have been violated.

---

[1] The loss of property does not just pertain to hard drives, and his court ordered laptop and charger, but also encompass all of his legal handwritten notes, and all the hard copies of all of his files that pertain to his case.

[2] See US v Lang, 21-cr-00053, ECF Doc. 129 at p. 8 (highlighting that Lang's posts "describing the post [of former Capitol Police Officer] as a 'veiled threat' ").

[3] See US v Lang, 21-cr-00053, ECF Doc. 129 at p. 9 (stating "[Lang's posts] contains captions identifying Lang as himself and the officers as 'Tyrants' ").

## II.    PARTIES

7.    Petitioner EDWARD JACOB LANG is twenty-eight-year-old United States Citizen from the great State of New York. In January of 2021, Lang was arrested in Newburg, New York, his hometown. Such arrested was in connection to his participation in the highly publicized protests occurred at the United States Capitol on January 6, 2021.  Lang has been in the custody of the United States Government since approximately January 14, 2021.  Lang is the single defendant charged in matter: *United States of America v. Edward Lang*, Case No. 21-cr-00053 (CJN), which is scheduled for a jury trial in late September 2024. However, because the 18 U.S.C. § 1512 charges against Lang were dismissed, and then appealed, he remains one of the two cases related to the *Fisher* case – where the United States Supreme Court, in *Fisher v. United States*, case #: 23-5572, granted the petition for a writ of certiorari.  If the *Fisher* case does not provide further guidance on or before September 2024, the Lang trial can be further adjourned. Also, Lang is currently being detained in Brooklyn MDC after being transferred yet again from D.C. Jail's Correctional Treatment Facility (hereinafter "CTF").

8.    Respondent MERRICK GARLAND is the Attorney General of the United States, and has led the Department of Justice since March 11, 2021.  Upon information and belief, Respondent Garland first sought Petitioner's pretrial detention, and his actions keep Petitioner detained today.  Logically, Respondent

Garland is ultimately responsible for Petitioner's unlawful detention and is named in his official capacity.

9.      Respondent HERIBERTO TELLEZ is the Deputy Warden of the Metropolitan Detention Center, Brooklyn (hereafter "MDC Brooklyn"). The address to the MDC Brooklyn jail is 80 29th Street, Brooklyn, NY 11232.  MDC Brooklyn houses "[m]ostly prisoners [with] pending cases in the United States District Court for the Eastern District of New York. MDC also holds prisoners serving brief sentences. As of April 2022, 1,712 prisoners are held in MDC Brooklyn." *Available at* [https://en.m.wikipedia.org/wiki/Metropolitan_Dentention_Center,_Brooklyn](https://en.m.wikipedia.org/wiki/Metropolitan_Dentention_Center,_Brooklyn) (last visited April 7, 2024). According to MDC Brooklyn Wikipedia page, former warden Cameron Lindsay actually stated, "The M.D.C. was one of the most troubled, if not the most troubled facility in the Bureau of prisons". *Id.* Respondent TELLEZ is charged by Respondent Garland with maintaining the custody and control of Petitioner who is currently detained at MDC Brooklyn as of the filing of this Petition.  Accordingly, Respondent Tellez is named in this action in his official capacity.

### III.    JURISDICTION AND VENUE

10.     Petitioner brings this action under 28 U.S.C. §§ 2241 and 2242 and invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202, the Fifth Amendment to the United States Constitution, the Sixth Amendment to the

United States Constitution, and the Eighth Amendment to the United States Constitution. Because he also seeks declaratory relief, Petitioner also relies on Rule 57 of the Federal Rules of Civil Procedure.

11.    This Court is empowered under 28 U.S.C. §§ 2241 to grant the Writ of Habeas Corpus and to entertain the Petition filed in the instant matter, filed by Petitioner Lang. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. §§ 2202, as this case involves an actual controversy within the Court's jurisdiction.

12.    Venue is proper in the United States District of Columbia since Petitioner is being detained based on United States District Court, District of Columbia, case entitled *United States of America v. Lang*, 21-cr-00053(CJN); and, even if the U.S. Marshals acting under the direction of the Respondent Attorney General were to shift Petitioner to another detention facility located within a different district, Respondent Attorney General, Petitioner's ultimate custodian, maintains an office in the district.  Further, a substantial part of the events giving rise to the claim occurred in the district, at least one respondent may be found in the district, and all respondents are either officers or employees of the United States or any agency thereof acting in their official capacities.  28 U.S.C. §§ 1391(b); 1391(e).

## IV.    STATEMENT OF FACTS

13.    Petitioner Lang is a twenty-eight-year-old United States Citizen from the State of New York, who has remained in a federal jail for over three years based on allegations surrounding the protest at the United States Capitol on January 6, 2021.

14.    Mr. Lang, to date, has not been convicted of a crime.

15.    Petitioner has no criminal history and is not a part of any hate group or organization espousing violence. He has no history of failing to appear in court.

### A.    PETITIONER LANG'S PERSONAL HISTORY LEADING TO THIS PETITION

16.    Lang was arrested, on or about, January 13, 2021 and remains incarcerated to this day. No weapons, anti-government reading material or paraphernalia was seized from Lang's apartment. His history shows respect for the system, the Courts, and does not establish a single incident outside of the instant charges where he showed hostility towards any government or law enforcement employee.

17.    He was picked up in Upstate New York, and after being moved around New York jails, he ultimately was moved to the DC Jail – a revolving door for the last three years.

18.    Lang has been moved out of the DC jail, and then back into the DC jail on numerous occasions. For example, to name a few, Lang was moved to:

(1) Lewisburg, PA jail – twice, (2) Arlington, VA, and (3) MDC Brooklyn – twice, where he currently remains housed.

19.    Additionally, as will be further explained below, a substantial amount of time while Lang was in the DC Jail, involved harsh treatment – aka Diesel therapy– and solitary confinement conditions. *See* https://en.m.wikipedia.org/wiki/Diesel_therapy#:~:text=The%20term%20%22diesel%20therapy%2C%22,Greyhound%20therapy%20in%20health%20care (highlighting that "The term "diesel therapy," or "dumping,"[4] is also used to refer to a method by law-enforcement personnel of getting rid of troublesome individuals by placing them on a bus to another jurisdiction.")[5].

20.    Below, this Petition will provide a detailed history of the events that pertain to Lang's incarceration since January 13, 2021.

21.    A more recent breakdown begins in **May 2023**, when Lang was moved yet again to the CTF section of the DC Jail.

22.    Once again, it did not take long for Lang to be placed back in solitary confinement, which took place again in **August of 2023**. Regardless of these harsh

---

[4] *Citing to* WR KING; TM DUNN (2004), *Dumping: police-initiated transjurisdictional transport of troublesome persons*, *Police Quarterly, archived from the original on* 2006-10-17, *retrieved 2010-06-05.*

[5] *Citing to* W WELLS; JA SCHAFER, *Officer perceptions of police responses to persons with a mental illness*, Policing: An International Journal.

circumstances, Lang was granted and court-ordered his own computer to review his discovery.

23.     However, his charger was taken from him, rendering the laptop unusable since **January 2024**.  In **January of 2024**, Lang was moved to the CDF section of the DC Jail[6], where there are no other January 6th detainees. What's more, inmates in that section are provided information – upon information and belief – to provoke such inmates in CDF to be violently aggressive towards, and even attack those alleged to have been involved with January 6th.

24.     After **five days in CDF**, Lang was moved back to CTF, and given back his court-ordered laptop and hard drives, however, he was still be withheld access to the charger for the laptop, so such materials continued to be unused.

25.     On the early morning hours of **February 20, 2024**, Lang was moved back to Lewisburg, PA, where he remained for 10-days before he was transferred back to MDC Brooklyn.

26.     While at MDC Brooklyn, Lang's court-ordered laptop cannot travel with him because such is being claimed to be "DC Jail property". The whereabouts of all of Lang's hard copy documents, and notes, remain unknown to this day. The unfortunate part of these facts and this story are this is not the first time that Lang's

---

[6] Upon further information and belief, Lang's legal possessions at this time were lost, and only some were ultimately returned to him, upon being transported back to CTF – his charger and physical documents are in continued dispute.

"paperwork" has not been returned to him after or during him being transferred from jail to jail.

## B.  PETITIONER'S PRIOR HISTORY AT THE D.C. JAIL- AKA "DC GITMO JAIL"

27.    Throughout the time Lang was in the DC jail, he was sent to "The Hole"[7] on at least five separate occasions.

28.    Within one calendar year – Lang spent more than six months in these solitary confinement conditions.

29.    **The first time** Mr. Lang went into "The Hole", was after asking for bible study and religious services, in that, on or about March 20, 2021 – Lang was dragged down to "The Hole"[8]. He remained in "The Hole" until approximately April 12, 2021. During **these three weeks**, Mr. Lang spent his 26th birthday in "The Hole", with no human interaction, hygiene products, or so much as a minute of sunlight.

30.    For a mid-twenty-year-old, whose first time in jail is under these circumstances – made a huge impact.

---

[7] "The Hole" is the DC Jail solitary lockdown confinement, where inmates have no sunlight, no interaction with other individuals, the individual loses all rights to use the phone or a tablet, and to even purchase basic necessities such as food and hygiene productions.

[8] When being dragged down to "The Hole", Lang was placed in cuffs while transported, and each time he left "The Hole" he was forced to stick his hands out of the door to be handcuffed again – and only then would officers transport Lang to the shower. While in the shower, Lang had to stick his hands out in order to be uncuffed.

31.     This is only the beginning, and such *merely stemmed from* a request to conduct a bible study group in his unit.

32.     **The second time** Lang was sent to "The Hole" was on May 14, 2021, where this time Lang spent approximately **three months in "The Hole"**.

33.     This second time Lang was forced to "The Hole" occurred after he was speaking in an open forum to other J6 inmates in Lang's unit about not taking bad "plea deals", "standing strong" despite their circumstances, and to each "have trust in God". The detention officers at the DC Jail did not like what Lang was "saying to others" in relation to "God",[9] or against the government's actions against the detainees – so, again Lang was dragged down to "The Hole".

34.     During this second trip to "The Hole", Mr. Lang was not charged with violating any jail facility rules, and was not served a single disciplinary ticket. Rather, Lang was only informed that his situation was "pending investigation", and that's why he was back in "The Hole".  Such circumstances should never be allowed or tolerated in a Federal Bureau of Prisons facility in this country. Disciplinary tickets, at a minimum, should be a prerequisite to even being moved into "solitary conferment", or "the Box", or "The Hole".

35.     The facts and this story then get better.

---

[9] Throughout this time in the DC Jail, Officers, one in particular, mocked Lang's religion and requests for bible study, and then nicknamed Lang "the false prophet". These claims have all been filed on the public docket involving the matter *US v. Lang*, 21-CR-00053 (CJN).

36.     Lang was released from "The Hole" **in August 2021 for only 12 hours**.

37.     Lang returned to his regular assigned housing unit at the DC Jail, CTF Unit, without any disciplinary charges having been filed or adjudicated, only to be happily met by others in his unit.

38.     Following Mr. Lang's return to his regular housing unit, other inmates began to assemble at Lang's cell door to speak with him, where Mr. Lang entertained his fellow J6 detainees by sharing new family photos that he had received during his experience back  in the infamous "Hole".  However, and again, the DC Jail housing unit detention officers did not like the display of fellowship and mutual support offered to Lang. The very next morning and without provocation, Lang received harsh instruction from the Supervisor of the Jail's Tactical Team, to pack up his belongings as he was being moved.

39.     As Lang complied and was gathering his belongings, detention officers busted into Lang's small cell, where he peacefully stood with a bible in his "left hand", and family photos in "his right hand". Sergeant Robinson, at the DC Jail who supervised the tactical team, entered the threshold to Lang's cell and profusely sprayed chemical mace into Lang's eyes and face. Sergeant Robinson[10] unleased at least half of the bottle of mace into Lang's face, and eyes.

---

[10] Upon information and belief, prior to this incident, Sergeant Robinson had been previously accused of abuse, assault, and brutality spraying other inmates – unprovoked – with pepper sprayed.

40.    As anyone's natural reaction would be after being mased in the face –

Lang wipe his eyes. But, officers' were actively refusing to let Lang clean or wipe

his face. In the heat of the event, Lang had mase in conjunction with astronomical

amounts of mucus dripping from his face.

41.    Then to add insult to injury, Officers continued to parade Lang around

the unit as to show other detainees what Lang's face looked like at the time.

42.    After being flashed to the entire CTF unit, Lang was then thrown back

into "The Hole" for **the third time**, this time naked.

43.    First, Lang was thrown in a shower designed for those who had just

been mased. This specific shower, however, did not wash away the chemical agents

sprayed in Lang's face. Rather, based on the substantial amount of mase utilized, the

oils dripped all over Lang's body, and went as far as to burn his genital area. While

this was taking place, female detention officers stood outside of the shower laughing

at Lang as he was soaked in mase. Second, Lang went from the shower to being

thrown back in "The Hole". This time he was not only naked, but also soaking wet

with mase oil burning now not only his face and eyes, but also his lower body.

44.    "The Hole" this time for Lang consisted of a single mattress on the floor

of the smallest room imaginable. The mattress was not even covered with a sheet.

While in "The Hole" this time, the wet oils on Lang seeped into the mattress, and

continued to burn Lang for weeks on end. Such an example establishes how strong this mase was and the amount wrongfully sprayed on him.

45.    Stated again and in another way, Lang was just in The Hole for 3 months, to only return to the CTF unit for approximately 12 hours.

46.    After hours without any clothes or sheets, Corporal Hayes (who is claimed to have continuously taunt Lang and make fun of his Jewish religious affiliation and practices – calling Lang the "false prophet") showed up at Lang's door. It is alleged that Corporal Hayes said to Lang, "I have all of your belongings" and "I need you to sign for them". Lang looked outside of his door and saw a single bag, and questioned "where are all my books, photos, legal papers, clothes, towels, toothbrushes? My things cannot possibly fix into that little bag"? Corporal Hayes then angrily looked at Lang and said, "This can happen one of two ways:

(1)    either you sign this document or,

(2)    I am going to pepper spray you again. You have already been through enough today, so just sign." Simply stated, Corporal Hayes coerced Lang into signing for "all of his property", before literally providing to Lang a single bag containing only a blanket and a sheet.

47.    At the time, Lang was literally naked, scared without any clothing, was recently sprayed a half of bottle of mace in his face, thrown into a shower, and then into a small room while still wet and had mace dripping all over his body.

48.    The effects of this event continued to play out, where Lang appeared virtually to his August 2021 court appearance. Lang conveyed to his attorney, one of the undersigned, that Lang currently did not have on underwear or socks, and reported to the District Court the substance of these conditions during such appearance. It took over a week before Lang received clothing. Two weeks later, Lang received his religious material, family photos, books, soap, previously purchased food items, shoes, towels and only "some" of his legal material. Lang then received three disciplinary tickets and was subsequently taken before an arbitrary Hearing Panel comprised of immigrant jail staff from the continent of Africa. During the hearing, Lang was not afforded the most basic rights, such as his Inmate Rights under the Jails own Policy for the calling of witnesses, and there was no recording made available at the Hearing for further review.

49.    Four witnesses stood ready and able to testify that Lang stood peacefully in his cell and officers entered his room and unloaded half a can of mase in Lang's face for absolutely no reason. Any of these witnesses would have changed the outcome. Further, a video in the CTF unit would have established the same thing, yet no video was turned over to Lang or the hearing board.[11] The following day, the opposing Hearing Officer was not on duty, yet the board went forward without any

---

[11] Lang was not served with notice of the alleged jail violations within the 5-day period pursuant to the Jail's policy. Moreover, the proceeding was so absurd that even one of the panel members was uncomfortable with having the proceedings go forward.

witnesses or witness statements on Lang's behalf. The board, upon information and belief, told Lang that his only recourse was to file a grievance.

50.     Obviously, Mr. Lang was found to have committed the allegations contained in all three tickets – and the imposed sanctions included losing all of his remaining inmate rights and privileges, e.g., (loss of social visits, the use a electronic tablet, and no commissary).  These sanctions lasted about four to five weeks. After **spending three weeks**, then **three months** in "The Hole"; Lang's **third time** in "The Hole" **lasted another month** before Lang got back out and to the regular CTF Unit.

51.     The amount of grievances Lang filed by this point is uncountable, most of which remain unanswered.

52.     Another example of the abuse and harsh treatment Lang received in the DC Jail, happened on August 18, 2021. On this date, outside of the jail, a rally was conducted in opposition of detaining J6 defendants. In the early morning hours and prior to start of the rally, Lang and almost every other J6 detainee was awakened from their sleep and ordered by approximately fifty members from the jail's Tactical Team to get up and step out of their respective cells carrying nothing except their issued mattress. The detainees were collectively informed that they were being

moved to an unknown location.[12] During the detainees' transition though the corridors of the jail, Lang began to sing the lyrics to the "Star Spangled Banner" in effort to psychologically ensure himself that he was not being led to what he can only describe as a feeling of being led to a mass slaughtering. During such journey, other inmates actually spoke about how they were being led into a mass slaughtering.

53.    While still holding his mattress, Lang was shoved against a corridor wall by none other than: Corp. Johnson, who then proceeded to physically assault Lang, with a  closed fist, striking Lang repeatedly in his ribs.

54.    Lang and the other detainees spent the following eight hours in the basement of the DC jail with no sink, toilet, or running water.

55.    Overall, Petitioner Lang is a pretrial defendant and was housed in 2021 more than the majority of the entire year in a 22 hour a day lock-down. That means he had only two hours, some days, to conduct all of the following: shower, call his family and loved ones, and interact with other human beings. In addition to being in "The Hole" for over six months, Lang went well over six months in a row without having a haircut, or a shave.[13]

---

[12] At no time was Mr. Lang or the other detainees alerted as to why or where they were being moved or when they would return. The detainees were moved into the basement of the jail.
[13] At the time, Lang and the affirmant joked that his appearance was similar to that of Tom Hanks in the movie Cast Away.

56.     Additional issues that arose during such time were that in Lang being moved, resulting in losing substantial amounts of legal documents, and then losing contact with his legal team, for weeks if not months at a time. Therefore, Lang was not even able to prepare for his own court hearings or speak with his attorneys in preparation of the criminal case against him for substantial periods of time. Then the defense had to start fresh when materials were lost. Further, for the first six months of Mr. Lang's detention, there was no Securis phone system in place for secure communications between detainees and their attorneys.

57.     Other deprivations ensued during such time, including but not limited to religious services. Lang is of Jewish faith, and thus requires Kosher meals. However, all requests for Mr. Lang's specific diet went unanswered or were denied. Due in part to the denial of adequate meals, on approximately May 5, 2021, Mr. Lang began partaking in first – of two hunger strikes. His first campaign lasting 4 days, and the second strike lasting for twelve days, from February 1st to the 12th of 2022. During the periods of the hunger strike Lang lost about 25-30 pounds and went to the medical ward for an overnight observation.[14]

---

[14] In addition to the condition of his meals, Lang predicated his hunger strikes on other causes such as:

    (1) justice for Ashley Babbitt and Rosanne Boyland, calling for a congressional investigation,
    (2) that all non-violent criminal history J6 Defendants be released on Bond, pretrial,
    (3) proper redress of grievances of the potential fraudulent 2020 election, and
    (4) haircuts and video visits immediately for those in the DC Jail, unit C2B.

While on his second hunger strike, Lang was frail and weak, and the jail moved Lang out of his regularly assigned housing unit and reassigned him to Housing Unit C2A, which is the two-week COVID-19 quarantine unit. So, Lang was in a frail physical state prior to having been placed into an atmosphere with others who were either exposed to COVID, or sick from COVID.

58.     Additional issues continued to ensue, in December of 2021, Lang's Securis Account was completely cut-off and remained unavailable to Lang for all purposes until the end of December 2021. On January 5, 2022, Mr. Lang's account was again disrupted and without warning, and no disciplinary tickets. Also, on or about January 5, 2022, all J6 inmate were requested to participate in a COVID-19 testing on a "voluntary basis". What was not disclosed is that jail staff gave no indication that not submitting to the testing would result in a complete 14-day individual lock down.

59.     As one reading would suspect, Lang did not want to be tested at the time. Between January 6th and 22nd of 2022, Lang was then restricted to his 70 square foot cell and only allowed to come out for a shower every three days. Also, he had no phone, no access to counsel, or religious services.

60.     This treatment and unconstitutional conditions continued, where throughout his time in the DC Jail, Lang is estimated to have filed at least fifty (50)

grievances. Then, out-of-nowhere, one night in early February of 2022, Lang was transferred to Lewisburg, PA.

## C.   LANG'S TRANSFER TO THE FAMOUS PENITENTIARY IN LEWISBURG, PA

61.    It took some time for Lang to settle in, after being transferred to the famous jail known as Lewisburg penitentiary (hereafter "United States Penitentiary, Lewisburg" or "USP Lewisburg"). While at USP Lewisburg, Lang was first subject to a two-week double bunk confinement, where he was essentially in a cell with another, and both were under quarantine.

62.    Once Lang got access to the phone, he was only afforded 500 minutes a month, which is approximately 16 minutes per day. Lang did not have access to a computer or tablet, and only could use the general computer available to everyone. But, when Lang sent out messages, each messages was flagged and took over a week to be received by its intended party. Likewise, it took over a week for Lang to receive an incoming message, so by the time he got a message, it was a week old.

63.    In conducting a legal visit, it took Lang's counsel more than three hours to travel to Lewisburg, PA, and then followed with more than three hours to get back to either New York, or the District of Columbia.

64.    Just as Lang and his counsel were figuring out the best way to communicate, in April of 2022, the U.S. Marshals then moved Lang, this time to the state of Virginia.

**D.   ARLINGTON, VA JAIL: 22 HOURS IN, AND ONLY 2 HOURS OUT.**

65.   Just as Lang was getting a system put in place for him to communicate with his defense team, he was transferred again, out of nowhere, with no notice. Lang was again moved, this time to Arlington, VA., where he housed in a setting that is 22 hours in, and only 2 hours out. That means that he has only two hours a day to make calls, take a shower, and have any interaction whatsoever. Such treatment is a demonstration of the disrupted nature to effective attorney / client communications and case preparations.

66.   Moreover, for the first six months of Lang's detention and in deprivation of his due process rights and fundamental fairness concepts, there was no secure phone access to attorneys with the Securis Inmate Telephone System. When counsel was allowed to visit Mr. Lang, on or about April 2, 2022 the parties were then placed in a community room where there was no attorney-client privileged means of communications at all. Further, Mr. Lang's meeting with counsel included three point body restraints, which made Mr. Lang's attorney visit both painful and non-productive.

67.   Then on July 13, 2022, Lang received a message that he was in violation of a Marshal policy, whereby he could not communicate with the media. Such threats for disruption of Lang's sole source of communication with the outside world continued. It is respectfully requested that this harsh, unconstitutional treatment

cease immediately, and that Lang be ordered to have access to his own tablet, with all of his specific and general discovery on such devise; additionally, that the Marshal's Office be ordered to not interfere with Lang exercising his First Amendment rights in speaking to whomever he chooses to.

### E.  AFTER BEING TRANSFERRED TO MDC BROOKLYN, LANG IS BACK AT THE DC JAIL

68.    On or about January 5, 2024, Lang renewed his application to be released on bond in the matter of *US v. Lang*, 21-cr-00053. Such application was supplemented twice and is currently awaiting a hearing, but initially was based on first, Lang being in solitary confinement for the last four months (November 2023 throughout February 2024) while at the DC Jail. The significance of Lang's last four months in the DC jail, and how his situation has drastically changed since his last bond application are that, he has remained and was thrown back in "The Hole".[15]

69.    Lang has been in "The Hole" for years, but this time is different. This time Lang has been awaiting an "investigation", all while he was attacked by another inmate. Without giving specific inmate details, various altercations have occurred with Lang, where he was attacked, and physically assaulted. The result has been for

---

[15] *See* Dr. Berrill's Report dated December 22, 2023 attached as **Exhibit A** to Defendant Lang's 2/2/2024 Application at ECF Doc. 125 (highlighting "Mr. Lang stated that he has not been outside for six months, has no fresh air in his cell, nor does he have exposure to sunlight.").

the DC jail to continue to throw Lang in "The Hole", pending investigation. Yet, this time its for Lang's own protection and safety.

70.     Next, while Lang awaits his trial and the US Supreme Court decision on the § 1512 counts in the *Fisher* case referenced above, Lang can utilize this time adequately to prepare his best defense.

71.     Furthermore, Lang has a *hybrid defense* representation motion pending for the District Court, where on the record the Court has indicated that the Court is "inclined" to grant such relief. If granted, Lang will essentially be a part of his legal team, and can also represent himself to a certain extent, depending upon the circumstances and defense strategy. This District Court's ruling on Lang's *hybrid* representation application is vital in how Lang can prepare and assist in preparing his defense.[16]  With regards to defense strategy, all of Lang's hard copy documents pertain to defense strategy. Attorney-work product information is no longer in Lang's possession, including notes, motions, legal theories, defenses, and the specific breakdown of exhibits – all of which, are all a key part to the legal papers

---

[16] Already filed on the docket sheet in Lang's criminal case is his argument that he has a Sixth Amendment right to participate in, and, indeed, conduct—his own defense. *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (highlighting "Counsel Clause" of the Sixth Amendment "implies a right in the defendant to conduct his own defense, with assistance at what, after all, is his, not counsel's trial."); *See also Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) (recognizing that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, such as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal") (*citing Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2509 n. 1, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring); ABA Standards for Criminal Justice 4–5.2, 21–2.2 (2d ed. 1980)).

Lang had in his position. However, Lang no longer has his notes, defense counsel's notes, all of the significant legal work products that go into formulating a defense. This is not the first time that Lang's vital paperwork has been stripped from him because such documents have not transferred with Lang each time he is moved to "The Hole", or to a different facility. This happens time-and-time again, where numerous motions have been filed on Lang's pending criminal, stating in substance that "we have to once again, start from scratch".

72.    Simply put, Lang has not stopped in his persistence in his desire to be a more active member in his own defense under the Sixth Amendment, which cannot be stressed enough.[17] In Lang and his defense team continuing to have to start from scratch each time he no longer has his legal documentation – the fairness of the situation must be taken into consideration. In this criminal case, and with Lang in-and-out of "The Hole", the defense is up against the entire weight of the federal government and all of its resources. Then hundreds of pages of legal documents, containing defense strategy are taken, misplaced, and ultimately are in the hands of the federal government, the jails, or its agents and employees. Lang cannot properly

---

[17] Mr. Lang needs to be able to assist in his defense obtaining all his trial witnesses and trial exhibits; not to mention he must be a more active participant in reviewing his discovery as to assist his defense in conducting theories for his defense and cross examination questioning, such examples do not include his ability to frame a complete defense. Additionally, Lang wishes to testify on his own behalf at his trial, and such pretrial measures need to be taken seriously and take time to prefect his best defense. Lang is in a unique position to substantially assist in each of these factors, which are examples and a non-exhaustive list of him being an asset to his own defense.

go up against the federal government, especially when all of Lang's legal strategies are being removed from him and placed in unknown federal employees' hands.

73.     With time running out, this Petition could not be more ripe, where Lang needs, desires, and will make the best of his time if given the right opportunity.

**F.   THE SECOND TIME PETITIONER LANG WAS TRANSFERRED TO LEWISBURG**

74.     February 19, 2024 was the last time Mr. Lang communicated or messaged me before he was transferred, yet again out of the DC Jail.

75.     To briefly go back – as mentioned above, Lang's last twelve months in jail need to be highlighted herein. The time frame is that in May 2023 Lang was moved back to the CTF section of the DC Jail – from MDC Brooklyn. Lang's current housing in MDC Brooklyn marks his second stint at such facility. To not get confused, prior to May 2023, Lang was at MDC Brooklyn. Then in May 2023, Lang was transferred back to CTF – at the DC Jail. Lang remained at CTF, peacefully between May and August of 2023. In August 2023, Lang was placed back in solitary confinement while at the DC Jail.[18]

76.     From August 2023 to February 2024, Lang continued in solitary confinement conditions. In January 2024, officers took the charger to Lang's laptop, thereby rendering the laptop unusable since such time, January 2024.  For five days

---

[18] It must be noted again, that during this time, Lang was issued his own, personal, computer while he remained at the DC Jail. But the charger to such computer was stripped from him in January 2024.

in January 2024, Lang was moved from CTF to the CDF section of the DC Jail[19], where there are no other January 6th detainees. After five days in CDF, Lang was moved back to CTF, and given back his court-ordered laptop and hard drives, however, he was still be withheld access to the charger for the laptop, so such materials continued to be unused.

77.     On February 19, 2024, Lang conveyed that officers asked Lang to have his temperature taken. In the past, such means that he is being transferred to another jail and that's why his temperature needed to be taken. The very next morning, on February 20, 2024 at 4:00 am, Lang was moved out of the DC Jail, and it took days for myself and Lang's family to learn that Lang was back in Lewisburg, PA. None of Lang's belongings were transferred with him to Lewisburg, PA.

78.     Lang was not able to make a single phone call. Out of concern, Lang's father made the trip to Lewisburg, PA on Sunday February 25, 2024. The rules for "visiting time" at USP Lewisburg state that visiting hours for a Sunday are between 8:00 am to 3:00pm. Nonetheless, Mr. Lang's father was denied access to visit his son, and to further ensure that Lang was mentally and physically in good shape.

79.     After ten days at USP Lewisburg, Lang was then transferred to MDC Brooklyn for the second time. Lang's pending bond application was scheduled for a

---

[19] At this point, Lang's legal possessions were misplaced or lost, and only a percentage of such were ultimately returned to Lang upon his transport back to CTF. To date, the whereabouts of his charger and physical documents are in dispute.

hearing on March 28, 2024. However, upon information and belief, representatives for MDC Brooklyn have been unable, and such hearing had to be adjourned, where no date has been further scheduled.

G.   THE CONDITIONS OF CONFINEMENT PETITIONER LANG HAS ENDURED AS A PRETRIAL DETAINEE, MUST NOT STAND

80.    Petitioner has been in federal custody since January 13, 2021.  Since the beginning of his detention until this date, Petitioner Lang has been subjected to disgusting unconstitutional conditions, punitive punishment, and treatment that can only be explained as the functional equivalent to torture.

81.    Petitioner Lang is under the immediate authority of the United States Marshals Service (hereafter "USMS"), who are under the authority and are directed by Respondent Garland.  USMS is a bureau within the U.S. Department of Justice under the authority and direction of the Attorney General, 28 U.S.C. § 561(a); *United States v. Tillisy*, No. CR09-269 MJP, 2022 U.S. Dist. LEXIS 121889, at p. 6 (W.D. Wash. July 11, 2022).

82.    Further, Congress has authorized the Attorney General to provide for "the housing, care, and security of persons held in custody of a United States marshal pursuant to Federal law under agreements with State or local units of government or contracts with private entities." 18 U.S.C. § 4013(a)(3).

83.    "[T]he Marshals Service does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements

to house prisoners. *Geo Grp., Inc. v. Newsom*, 493 F. Supp. 3d 905, 920 (S.D. Cal. 2020) (*quoting* U.S. Marshals Serv., Fact Sheet: Prisoner Operations 2 (2019) . . .").

84.    The facts remain that Petitioner Lang is currently being detained as a federal detainee at MDC Brooklyn, which unquestionably is housing Petitioner pursuant to an intergovernmental agreement with USMS.   MDC Brooklyn is functioning as an agent or extension of the Federal Government as Petitioner's caretaker.  MDC Brooklyn, according to the last warden ". . . was one of the most troubled, if not the most troubled facility in the Bureau of prisons". *Available at* https://en.m.wikipedia.org/wiki/Metropolitan_Dentention_Center,_Brooklyn  (last visited April 7, 2024).

85.    Regardless of its location in NYC, MDC Brooklyn is under the direct control of the District Columbia Department of Corrections (DC DOC).

## H.   DEPRIVATION OF PETITIONER'S CONSTITUTIONAL RIGHTS: LET'S START WITH THE FIRST AMENDMENT

86.    Petitioner has been denied his clearly established right to religious services, in violation of the First Amendment, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc.  Petitioner's first time being thrown in "The Hole" started with his passion to follow his rights to religious services. Then, as explained above, Officers at the DC Jail mocked and prayed on Lang as if his religion was a weakness,

calling him the "false prophet" not only to his face but to others as well. This list can go on-and-on and the grievances Lang had to file only tell a portion of this outrageous story.

87.   Petitioner has been denied the clearly established right to worship or from participating in Bible studies of any kind.

88.   Upon information and belief, many of the guards who have openly attacked Petitioner and other January Sixers regularly read and leave around the units "The Final Call". These officers can easily radicalize inmates with this propaganda.

89.   The unsolicited distribution of Islamic fundamentalist literature to a vulnerable prisoner trapped in a cell rises to the level of state sponsored religion, even more than requiring "religious conformity from a student as the price of attending her own high school graduation." *See Lee v. Weissman,* 505 U.S. 577 (1992).

90.   Overall, Petitioner is routinely punished based on him expressing his political views.  He is further targeted based on political beliefs that guards believe Lang possesses based on the assumption that he is a Trump supporter. Further, Petitioner Lang has been regularly denied freedom of speech by being denied access to reading materials and his ability to practice, and receiving a diet consistent with his religious beliefs.

## I.   DEPRIVATION OF CONSTITUTIONAL RIGHTS:   SIXTH AMENDMENT

91.     Petitioner's attorney-client privileged calls are routinely and illegally monitored, which is something that has happened since he was first detained. Petitioner's ability to meaningfully participate in his defense has repeatedly been interrupted at each jail he has been housed at, regardless if it's while Lang is at the DC Jail or MDC Brooklyn.

92.     Petitioner routinely has his discovery confiscated without ever being given notice or being told why his discovery is being taken.

93.     Because of this, Petitioner was precluded from being able to review videos, reports, and meaningfully participate in his defense during the entire time that significant motions have been pending. The current bond motion is a perfect example. As we were awaiting to receive the bond opposition, and put together the reply, requesting a hearing – Lang was transferred to Lewisburg, PA within 24 hours of the government's opposition being filed. Then Lang was denied access to his attorneys for more than ten days.

94.     Again, Petitioner Lang has been adamant about his involvement in his defense and has a hybrid representation motion pending. Further, Petitioner was ordered his own computer to review discovery, but has not had access to such since the beginning of this year, January 2024. Furthermore, given Petitioners court ordered history, he has never been granted access to the Relativity.com, a discovery

database.

## J.   DEPRIVATION OF CONSTITUTIONAL RIGHTS:  FIFTH AND EIGHTH AMENDMENTS

95.      Petitioner is a pretrial detainee, as such he is presumed innocent and cannot and should not be punished. Despite such, Petitioner has been subject to unjust punishments including, but not limited to, the following:

a. Arbitrary and capricious use of solitary confinement;
b. Falsely charging Petitioner without cause;
c. Maliciously sentencing Petitioner to prolonged Solitary confinement;
d. Denial of medical care;
e. Laughing at Petitioner when forced to shower after being maced in the face;
f. Confiscation of discovery and legal paperwork;
g. Denial of discovery;
h. Confiscation of personal belongings;
i. Targeted harassment by guards including racial slurs; and
j. Targeted harassment by guards including threats of physical harm;
k. Physically harms by guards, including being punched in his stomach;
l. Denial of proper drinking water and proper food;
m. Being physically assaulted, maced, and cell raided by guards for no reason;
n. Denial of sunlight, outdoor time, and recreational activities
o. In order to provoke fear and intimidation, the guards have paraded Petitioner through the CDF unit, where inmates despise J6 inmates.

96.      Petitioner Lang's case symbolizes that 'solitary confinement' at various federal jails actually does take place to one who is a pretrial detainee.  In

practice, these facilities isolate prisoners for 22-23 hours a day with no other human contact.  By definition, that practice is solitary confinement, regardless of what any government employee calls it.

97.    In addition to confining Petitioner under conditions that, by themselves, violate his civil rights, during his time in prison as a pre-trial detainee, the DC Jail has (1) shown deliberate indifference to his health, by repeatedly placing him in prolonged solitary confinement; (2) deprived him of numerous basic constitutional rights; (3) arbitrarily, capriciously, and unlawfully punished him, despite his status as a pre-trial detainee, and not that of an inmate; and (4) subjected him to unlawful brutal physical and psychological torture.

## K.    THE INMATE GRIEVANCE PROCESS IS IRREPARABLY BROKEN

98.    Petitioner has exhausted all of his remedies using the process for grievances at the DC Jail.  There is *prima facie* evidence that the Inmate Grievance Process (IGP) is corrupted, futile, ineffective, and irreparably broken.  Petitioner has submitted over 100 requests and has carefully documented them and the DOC officials' responses.  The documentation shows a clear pattern of obstruction that makes it impossible for Petitioner or any inmate to have even the most serious and life-threatening grievances addressed.

99.    Regarding the DC Jail's failure to respond to Petitioner's mental health request, demonstrates the corrupted, futile, ineffectual, and irreparably broken nature of the grievance process.

100.    Petitioner has filed well over 50 grievances regarding the above-mentioned wrongful acts. Most of those grievances have been flatly ignored by the jail Petitioner was located at the time of filing. The DC Jail and Arlington, VA jail has a high non-responsive rate. If such is responded to, then the response is to sweep the matter under the rug. These lack and inadequate responses are sufficient grounds to conclude that the grievance process at the jails Petitioner has been transported to are completely broken.

101.    Petitioner's grievances are routinely thrown in the trash, ignored, or falsely marked as having been sufficiently addressed.

102.    This purposeful obfuscation of the grievance process is a calculated decision in the federal jails to prevent Petitioner and others like him from being able to demonstrate that he or they have exhausted all administrative remedies, because doing so, will delegitimize detainee claims of misconduct and procedurally dismiss any civil rights lawsuits and/or habeas petitions at conception.

103.    All of this is designed to intimidate, silence, punish, and ensure that the grievance process fails.  And by doing so, they send a message to these American citizens that they should shut up or face torture.

104.   In a deliberate and coordinated effort by DC Jail staff to sabotage countless grievances, the federal jail system jail has created a system of disqualifying the grievances that it does respond to, making it near incredibly difficult for any grievance to be properly escalated for the specific purpose of making the exhaustion of administrative remedies requirement impossible.

105.   Petitioner Lang before going on hunger strikes submitted countless grievances addressing the inadequate meals he was receiving and even listing calorie counts. Every single grievance was ignored, and that not even getting into the fact that his meals did not conform with his religious practices.

106.   This process is completely unreasonable as grievances can affect ones mental and physical health.

## V.   LEGAL STANDARD

107.   A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by the color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States. *See* 28 U.S.C. §§ 2241(c)(1), (3).

108.   Aside from § 2241, this Court has jurisdiction under 28 U.S.C. § 1331, as an equitable cause of action under the Constitution.  *See Ziglar v. Abbasi* at 137 S. Ct. at 1865 (holding detainees challenging conditions of confinement could seek an injunction).

109.   Sections 2201–02 of Title 28 of the United States Code further provide that a court may, upon the filing of an appropriate pleading, declare the rights and other legal relations of any party seeking such declaration.

110.   The Due Process Clause of the Fifth Amendment forbids the government from depriving a person of life, liberty, or property without due process of law. *See* U.S. CONST. AMEND. V.

111.   Pretrial detainees have a Constitutional right to be free from punishment prior to conviction. *See Bell v. Wolfish*, 441 U.S. 520, 99 (1979) ("holding that, under Due Process Clause, a detainee may not be punished prior conviction"). To establish punishment, proof of intent or motive to punish is not necessary, rather, a pretrial detainee can prevail on a claim that his due process rights were violated by providing objective evidence that a challenged governmental action is not related to a legitimate governmental objective or that it is excessive in relation to that purpose. *Kingsley v. Hendrickson,* 576 U.S. 389 (2015) (*citing Younberg v. Romero,* 457 U.S. 307, 322 (1982)).

112.   Regarding conditions of confinement, the proper avenue for pretrial relief is the Fifth Amendment's due process clause, which is triggered when a pretrial detainee can demonstrate that their conditions of confinement subject them to exposure to serious illness, especially illness related to a preexisting condition that can lead to death. *See United States v. Martin*, 447 F.Supp.3d. 999 (D.Md. 2020);

*see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, 576 U.S, 389m (2015) (citing *Younberg v. Romero*, 457 U.S. 307, 322 (1982)). *United States v. Riggins*, 456 F.Supp.3d 138 (2020) citing *Hardy v. District of Columbia,* 601 F.Supp. 2d 182,188 (D.D.C. 2009).

113.   Because pretrial detainees are presumed innocent, they are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. The threshold question "is whether the prison conditions amount to punishment of the detainee." A condition amounts to punishment if it is "not reasonably related to a legitimate institutional goal". *See United States v. Riggins*, 456 F.Supp.3d 138 (2020) (*citing Hardy v. District of Columbia*, 601 F.Supp. 2d 182,188 (D.D.C. 2009)).

## VI.  CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF:
### RESPONDENT'S DELIBERATE INDIFFERENCE TO PETITIONER'S SAFETY VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

114.   Petitioner repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this petition with the same force and effect as if set forth at this point. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are subjecting him to unlawful pretrial detention amounting to punishment by acting with deliberate indifference to his health and safety.

115.   New York State's HALT Act and the Mandela Rules define solitary confinement as confinement for twenty-two hours or more per day absent meaningful human contact, and prolonged solitary as solitary confinement for more than fifteen days.

116.   Both the HALT Act and the Mandela Rules ban the use of solitary confinement for any period of time against those with mental or physical disabilities, and ban the use of prolonged solitary confinement under any set of circumstances— flatly denouncing the practice as torture.

117.   Moving away from the use of solitary confinement as a means to punish, because the damage this inhumane practice inflicts on the human mind significantly outweighs any government interest.

118.   Petitioner asserts that Respondents were, on multiple occasions, put on notice that  Petitioner's safety was at issue.

119.   The DC Jails response to Petitioner's safety is to move him from CTF to CDF, and place him in a more hostile, violent part of the jail because Petitioner's status as a J6 defendant was well known. Then when that did not work, Petitioner was put back in "The Hole."

120.   The DC Jail took no action to protect Petitioner from other inmates the DC Jail knew about- which caused a safety concern in the first place. The treats

toward petitioner were coming from other DC Jail inmates, and no action has been taken against these individuals.

121.   Clearly, Respondents have subjective knowledge of what is and is not in Petitioner's best interest when it comes to his safety.

122.   So what is done next, Petitioner is transported out of the DC Jail, to sit in Lewisburg, PA for ten days with no contact. Then Petitioner is shipped back to NYC, to be housed in one of the most violent jails, hours away from Washington, D.C., where his criminal case remains pending.

123.   Petitioner asserts that Respondents recklessly disregarded the excessive risk to Petitioner's health and safety when they repeatedly placed him in solitary confinement knowing full well that there was no justification to do so. In doing so, Respondents utterly disregarded the substantial risk or serious damage that it would do to Petitioner Lang's mind and well-being.

124.   Petitioner asserts that Respondents that have repeatedly tortured Petitioner by placing him in prolonged solitary confinement on multiple occasions. Petitioner was placed in prolonged solitary confinement and forced to sign a document that he received all of his property, while he laid naked on a bare mattress after being sprayed with a substantial amount of mace in his face.

125.   Respondents' wanton disregard for Petitioner's safety and well-being has already caused irreparable harm and a substantial likelihood that continued detention will result in permanent catastrophic harm.

126.   Therefore, Petitioner has been irreparably harmed by Respondents repeated unlawful conduct specifically directed at Petitioner.

### SECOND CLAIM FOR RELIEF:
### RESPONDENT'S ILLEGAL USE OF SOLITARY CONFINEMENT TO PUNISH PETITIONER VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

127.   Petitioner repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this petition with the same force and effect as if set forth at this point. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are illegally punishing him in violation of his constitutional rights, by repeatedly placing him in solitary confinement.

128.   As stated above, Petitioner has undergone substantial harsh treatment while in pretrial detention, which can only be defined as solitary confinement.

129.   Petitioner's pretrial treatment should not be acceptable in our modern world.

130.   No individual should be subjected to solitary confinement, not even for even one day, because solitary confinement is the kind of *punishment* that will

expose an already sick or weakened person to unnecessary suffering or serious complications.

131.   It cannot be stated enough, solitary confinement should not be used against pretrial detainees because pretrial detainees are not allowed to be punished.

132.   Petitioner Lang seeks to be an active participating member of his defense. The treatment he has received for years simply interferes with Lang's goals. At what point does one say, enough is enough.

133.   In light of all the above, and more, Petitioner has suffered in prolonged confinement for more than a year now in pretrial confinement. The overwhelming evidence, therefore, supports Petitioner's claim that his Fifth Amendment due process rights to be free from punishment have been grossly violated at the hands of the Respondents.

### THIRD CLAIM FOR RELIEF:
### RESPONDENT'S ILLEGAL USE OF PROLONGED SOLITARY CONFINEMENT TO PUNISH PETITIONER VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE AND THE EIGHTH AMENDMENT'S CRUEL AND UNUSUAL PUNISHMENT CLAUSE

134.   Petitioner repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this petition with the same force and effect as if set forth at this point. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are subjecting Petitioner to cruel and unusual punishment by locking him in prolonged solitary confinement

with the full knowledge that he has a serious pre-existing medical condition, and by doing so violating his Fifth and Eighth Amendment rights.

135.   Prolonged solitary confinement is recognized as torture under New York State and International Law.  The use of prolonged solitary confinement, in the context of pretrial detention, therefore, is flatly illegal because there is no question as to whether prolonged solitary confinement is punishment.

136.   The real question here is whether Petitioner Lang has been subject to confinement that is equivalent to torture.

137.   One example is, after spending 3 weeks, then 3 months in "The Hole", this third round lasted another month before Lang got back out of "The Hole". The amount of grievances Lang filed by this point is uncountable, most of which remain unanswered.  This treatment continued, where throughout his time in the DC Jail, Lang is estimated to have filed at least fifty grievances. Then, out-of-nowhere, one night in early February of 2022, Lang was transferred from the DC Jail to Lewisburg, PA. Just as Lang and his counsel were figuring out the best way to communicate, in April of 2022, Lang was then moved by the U.S. Marshal to a pre-trial holding facility in Lewisburg, VA.

138.   Mr. Lang was recently evaluated by a Dr. Berrill to determine if his current situation, and such deprivations, will have a future psychological effect on Mr. Lang, and to what extent. Dr. Berrill's determination is based on the emotional impact that Lang has incurred, and the manner in which, his mistreatment at the jail since his arrest could affect anyone in this situation psychologically. No pretrial detainee can adequately prepare a defense under these circumstances.

139.   In addition to the lack of medical treatment, the food that Lang has been provided paints a clear picture. For Example, first, on **April 10, 2022** Lang filed a grievance: "For breakfast Sunday 4/10 . . . I was supposed to receive 1 cup of fruit, milk, cereal, 2 slices of bread and 2 packets of jelly. I received NONE of these. I am on a kosher diet. Need this resolved ASAP. Happens often". The result: no response from Alexandria, VA jail.

140.   Second, on **June 13, 2022** Lang filed another grievance stating, "The kosher tray is only 350 calories . . . There isn't enough calories per meal to satisfy a clown man. We need 2500-3000 calories a day. You are starving us!!" Alexandria VA jails response:  "We are following the approved Kosher menu for this facility. . . ." 6/15/2022 Brandon Lewis.

141.   Third, on **July 25, 2022** Lang filed yet another grievance explaining, "Kosher meals are lacking in (1) fruit every meal, (2) daily calories, (3) daily protein." Specifically, he highlighted:

**Breakfast** 1oz of Peanut butter 150 cals, 1 milk 110 cals., cereal 200 cals, bread 100 cals.
**Lunch** (My own meal) 350 Cals, bread 100 cals, juice 60 cals
**Dinner** (My own meal) 350 cals, bread 100 cals, juice 60 cals, 2 cookies 80 cals = 1650 cals daily!!

Malnourishment!! Need 2500 cals a day, grown man.

142.   The response from Alexandria VA jail:  I follow the approved menu for this facility. I do not have the authority to change any menu or make alterations. The menu was made by the dietician and approved by the jail." Signed by Deputy on 8/3/2022, and Supervisor on 8/4/2022.

143.   Fourth, not realizing the most basis response, the jail signed off on August 3rd and 4th,  Lang filed another grievance on **August 20, 2022**, stating, "I grievance you 3 weeks ago about inadequate kosher tray nutrition. . . Please Answer." Alexandria VA jails response:  "I respond to all grievances as soon as I receive them. And also the Kosher diet is based on a 3000 calorie daily average. The kosher bag is counted in the calorie counts. The dictician (sic) reviewed and the Centre approved."  Signed as follows: 8/21/2022 Brandon Lewis.

144.   A dinner tray that is so small as to be described as "**Dinner** (My own meal) 350 cals, bread 100 cals, juice 60 cals, 2 cookies 80 cals" is simply not enough nutrition for a grown man, especially when the jail will not remedy the issue and responses to grievances with "your Kosher trays" are based on "a 3000 calorie daily average", and such is clearly inaccurate.

145.   These examples are only pertaining to diet, and the lack of food Lang has been provided for years.

146.   In this case, these horrible acts have been committed against a United States Citizen detainee without a scintilla of evidence to justify such actions.

147.   In light of the circumstances in this matter, Respondents actions are particularly egregious and unfortunate, thereby violating Petitioners Fifth and Eight Amendment rights.

### FOURTH CLAIM FOR RELIEF:
### RESPONDENT'S REPEATED INTERFERENCE WITH PETITIONER'S RIGHT TO COUNSEL AND TO MEANINGFULLY PARTICIPATE IN HIS DEFENSE VIOLATES PETITIONER'S SIXTH AMENDMENT RIGHTS

148.   Petitioner repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this petition with the same force and effect as if set forth at this point. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents are subjecting Petitioner to unlawful pretrial detention because Respondents have repeatedly and deliberately interfered with Petitioner's Sixth Amendment Right meaningfully participate in his defense.

149.   Again, Petitioner was granted a court-ordered laptop, so as to allow him to review his specific discovery. But Petitioner continues to get transferred from jail-to-jail, at times during crucial parts of his pending criminal case. While at MDC Brooklyn, Lang's court-ordered laptop cannot travel with him because such is being

claimed to be "DC Jail property". The whereabouts of all of Lang's hard copy documents, and notes, remain unknown to this day. The unfortunate part of these facts and this story are this is not the first time that Lang's "paperwork" has not been returned to him after or during him being transferred from jail to jail.

150.  Further, Petitioner Lang has a *hybrid* representation motion currently pending before the honorable Carl Nicolas, where such application the Court is "inclined" to grant, thereby affording Lang greater access to participate in his own defense. If granted, Lang will essentially be a part of his legal team, and can also represent himself to a certain extent, depending upon the circumstances and defense strategy. This District Court's ruling on Lang's *hybrid* representation application is vital in how Lang can prepare and assist in preparing his defense.

151.  Further, as noted above – defense strategy has constantly been stripped from Lang, where federal agents are taking and/or confiscating all of Lang's hard copy documents pertaining to defense strategy. (*See Supra* at p. 22-24, ¶ 71-72). The fairness and balance of equities cannot be stressed enough when *attorney-work product* is no longer in the defense's hands, and rather in the hands of others. Lang's possessions, including notes, motions, legal theories, defenses, and the specific breakdown of exhibits – such as notes on specific videos have all been taken from Lang.

152.   Lang no longer has his notes, defense counsel's notes, all of the significant legal work products that formulate the best defense.  This is not the first time that Lang's vital paperwork has been stripped from him because such documents have not transferred with Lang each time he is moved to "The Hole", or to a different facility.

153.   All of Lang's defense strategies are now out there, and it's time to call a spade-a-spade. In Lang and his defense team continuing to have to start from scratch each time he no longer has his legal documentation – the fairness of the situation and Lang's inability to properly go up against the federal government must be emphasized.

154.   As noted above, such has been filed on the docket sheet in Lang's criminal case: Lang has a Sixth Amendment right to participate in, and, indeed, conduct—his own defense. *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (highlighting "Counsel Clause" of the Sixth Amendment "implies a right in the defendant to conduct his own defense, with assistance at what, after all, is his, not counsel's trial."); *See also Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983) (recognizing that "the accused has the ultimate authority to make certain fundamental decisions regarding the case, such as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal") (*citing Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2509 n. 1,

53 L.Ed.2d 594 (1977) (Burger, C.J., concurring); ABA Standards for Criminal Justice 4–5.2, 21–2.2 (2d ed. 1980)).

155. Further, it's no surprise that Petitioner's attorney-client privileged calls are routinely and illegally monitored, which is something that has happened since he was first detained. Then Petitioner routinely has his discovery confiscated, lost or destroyed when he is transported to another jail for no reason, or without explanation. Some material does eventually get turned back over, but the point remains very simple: numerous hard copy documents are no longer in Petitioner's possession. This material took hours, weeks, and months to comprise and are all part of defense strategy. Such treatment is unacceptable.

156. It cannot be stressed enough that Petitioner also has a constitutional right to meaningfully participate in his defense. Respondents are collectively, and successfully ensuring that Petitioner be held without bond. Respondent Garland has also created a discovery system which prohibits defendants in a criminal case, who are detained, such as Petitioner, from using the Relativity database to access his discovery for unjustifiable reasons.

157. In addition to denying Petitioners ability to prepare a defense, his attorney-client privileged calls have been routinely and illegally monitored since he was first detained.

158.   This deliberate interference with the sacred attorney-client privileged relationship is illegal and violates Petitioner's Sixth Amendment right to counsel. The damage Respondents have caused, and continue to facilitate cannot be understated, where the outcomes can mean years and years of Petitioner's life and freedom.

**FIFTH CLAIM FOR RELIEF:**
**RESPONDENT'S REPEATED RETALIATION FOR SPEAKING TO THE PRESS AND THE PUBLIC ABOUT HIS UNLAWFUL DETENTION VIOLATES PETITIONER'S FIRST AMENDMENT RIGHTS**

159.   Petitioner repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs of this petition with the same force and effect as if set forth at this point. Petitioner incorporates and re-alleges the foregoing paragraphs by reference and alleges that Respondents' mistreatment and punishment of Petitioner while he is in their custody was done in retaliation for exercising his First Amendment rights of speech and to petition Respondents and the Government to redress his grievances.

160.   Petitioner's ability to speak to the public has been infringed on a daily basis, and has been routinely and illegally monitored since he was first detained.

161.   This deliberate interference with Petitioner's sacred rights to free speech is illegal and violates Petitioner's First Amendment rights.

## VII.   CONCLUSION

162.   Respondents have repeatedly violated Petitioner's due process rights as a pretrial detainee to be free from punishment while he is being detained for trial.

163.   Respondents have also violated Petitioner's right to be free from cruel and unusual punishment by locking Petitioner in prolonged solitary confinement under circumstances that violate his human and civil rights.

164.   Respondents have also treated Petitioner with deliberate indifference. Respondents have not only failed to properly care for Petitioner but have exacerbated his safety concerns, and overall well-being.  The psychological damage that has already been inflicted through unlawful punishment and torture may not have manifested just yet, but will unquestionably have long term effects on Petitioner.

165.   As a result of Petitioner's pretrial detention treatment, Petitioner is at grave risk for continued serious injury or death if he remains in Respondents' custody.

166.   As such, Petitioner must be released at once.

## VIII.   PRAYER FOR RELIEF

167.   Petitioner respectfully requests that this Court:

    (1)    Grant this Writ and an Order under 28 U.S.C. § 1331, 28 U.S.C. §§ 2201–02, and Federal Rules of Civil Procedure 57 and 65 declaring that Petitioner is being held in violation of his Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, and to Order the Petitioner to be immediately released from Respondents' unlawful custody;

(2)    Enter a temporary restraining order, preliminary injunction, and a permanent injunction banning the use of solitary confinement and prolonged solitary confinement against pretrial detainees;

(3)    Pending final resolution of this petition, and pursuant to this Court's inherent powers, order Respondents to take all steps necessary to effectuate Petitioner's prompt release to the custody of either his mother or father, or order an expedited hearing on the Petition;

(4)    Award the writ or issue an order directing the Respondents to show cause why the writ should not be granted, pursuant to 28 U.S.C.  2243, within three days;

(5)    Award Petitioner his attorney's fees and costs; and

(6)    Grant such other relief as the Court may deem necessary and appropriate.

Dated:  April 11, 2024                    Respectfully submitted,

                                         */s/ Steven Alan Metcalf II*
                                         _____
                                         STEVEN A. METCALF II,
                                         ESQ. *Attorneys for Mr. Lang*
                                         **Metcalf & Metcalf, P.C.** 99
                                         Park Avenue, Suite 810
                                         New York, NY 10016
                                         *Phone* 646.253.0514
                                         *Fax* 646.219.2012
                                         metcalflawnyc@gmail.com